ROBERT L. CARNAHAN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 12040, 12041. Promulgated December 31, 1947.

*William H. Quealy, Esq.*, and *H. C. Castor, Esq.*, for the petitioner.
*Gene W. Reardon, Esq.*, and *Harlow B. King, Esq.*, for the respondent.

OPINION.

VAN FOSSAN, *Judge*: This is a companion case to that of *Max Cohen, supra*, and involves the same income sources. As observed in that case, the night clubs where liquor was sold and gambling carried on, the operation of slot machines, and the operation of an establishment where bets could be placed on horse racing in all parts of the country were all in violation of the laws of the State of Kansas.

The principal items added to petitioner's income were designated by respondent as "income not reported," which item corresponds to the item "excess cash expenditures" in the *Cohen* case. Cohen and petitioner were associated in their relations to the various illegal slot machine, liquor, and gambling businesses. In our findings of fact we have indicated how respondent arrived at the amounts determined as "income not reported."

Although the present case is one step removed from the expenditures which form the basis of the findings of the respondent in the *Cohen* case, the considerations and authorities which led us to approve resort to "excess cash expenditures" as a method of ascertaining unreported income in the *Cohen* case lead us to approve the method adopted here to determine "income not reported." The petitioner had the burden of proving this finding to be in error and this he has not done. The record does not establish that respondent erred as to this item. See *Kenney v. Commissioner*, 111 Fed. (2d) 374.

The question of income from the Ray Watson slot machine route is disposed of by our finding that the petitioner's share of such profits was 25 per cent, which is the amount returned by him.

The third issue is presented by petitioner's contention that in all of the several activities involving night clubs and profits from gambling he was engaged in partnership operation and entitled to set off his individual gambling losses against partnership gambling gains (*Jennings v. Commissioner*, 110 Fed. (2d) 945).

The respondent contends that there was no partnership in any instance and that the chief consideration for the payments by the club operators and others to Cohen and Carnahan was the furnishing of protection from arrests and prosecutions by the law enforcement agencies of Sedgwick County and the State of Kansas.

It is significant that neither Cohen nor Carnahan spoke one word in denial of the charge by the Government that they received payments for protection. Cohen, though present in the court room, never took the witness stand (see *Wichita Terminal Elevator Co.*, 6 T. C. 1158, 1165), and Carnahan, who appeared as a witness, did not deny either the receipt of the money for protection or any of the accusatory statements made by other witnesses. Their personal behavior was

very similar to that which characterized their trial in the United States District Court when both of them pleaded *nolo contendere.*

In view of the large money returns, it is utterly unreasonable to believe that the temporary need of money for the operation of gambling tables, the "bank roll," was the sole reason for introducing Cohen and Carnahan into the several transactions. If this were true, why was the money advanced not treated as a loan and paid back and the debt discharged as soon as the club proved profitable? If the payments to Cohen and Carnahan were not a form of tribute, or payments for protection exacted by compulsion, why did the club owners and operators continue to pay, year after year, some as high as 75 per cent of the earnings, amounting to many times the sum claimed to have been advanced as the "bank roll"? All reasonable inferences from the situation tend to support the testimony that no "place" could operate in Sedgwick County without paying Cohen. To pay Cohen was to pay Carnahan.

On the record, we are convinced not only of the fact that the Commissioner's contention was not disproved, but further as to the affirmative of the issue, i. e., that the record fully supports the Commissioner's contention that a large part of the payments received by the petitioner was for protection. This holding is basic in the disposition of this case. Petitioner claimed huge personal gambling losses and set them off against the income admittedly received and reported from the night clubs. The Government, on the other hand, disallowed most of these gambling losses because not set off against gambling gains, denying thereby that the petitioner was engaged in partnership operations from which gambling gains were derived. Even if it be agreed that petitioner can set off individual gambling losses against partnership gambling gains (*Jennings* v. *Commissioner, supra*), and if it be agreed that petitioner was a partner with Cohen or others as to furnishing the "bank roll," petitioner must still fail. The proof does not establish the amount of any partnership gains, as such. It likewise is not proven what specific sums are attributable to the furnishing of the "bank roll" and what to the furnishing of protection. The protection consideration permeates all of petitioner's profits from slot machines, gambling, and night clubs. Therefore, we are unable to sustain petitioner's contention with respect to the setting off of gambling losses, aggregating more than $140,000, in any part other than the $6,600 reported personal gains which have been allowed by the respondent.

There are other reasons which would require the disallowance of the claimed gambling losses for most of the years. Much of the testimony calculated to support the alleged gambling losses was couched in such form and came from such sources as to make it unreliable and unbelievable. Although the Government concedes a loss of $29,863.08 in

1941 in operating a "horse book," or a place where wagers were accepted on horse races being run on different tracks throughout the country, petitioner can get no benefit, as he reports no gains from such operation.

As to 1942, we are not persuaded as to the accuracy of the testimony supporting the claimed loss of $25,000 said to have been lost by the petitioner in Chicago. The cavalier manner in which petitioner called the accountant who was preparing his tax return and told him to take $25,000 as a gambling loss and the tone and form of the confirmatory letter are such that we are unimpressed as to the truth and authenticity of the claimed loss. We find ourselves in agreement with the Government's action. Petitioner's counsel concedes that the petitioner's plea of *nolo contendere* is effective in making applicable the fraud provision of section 6 (a) of the Current Tax Payment Act of 1943. Therefore, respondent is not barred from the assessment and collection of any deficiency for the year 1942.

The alleged loss of $28,845 net, claimed to have been sustained at New Orleans in 1943, was substantiated by exhibition of canceled checks aggregating some $31,000, which sum was reduced by gambling gains of $2,000. Petitioner's testimony was also supported by the testimony of another gambler who accompanied petitioner on the trip. Here again petitioner fails from the absence of gambling gains.

In 1944, in which year petitioner claimed a gross loss of $36,550 and a net loss of $34,550, he admits that $8,050 of such sum was never paid. As to this year's alleged loss, we have only petitioner's bare, unsupported testimony. Half of the alleged loss was claimed to have been from "pocket cash." Even if we held the loss to be substantiated, which we do not, petitioner yet meets the insuperable obstacle of the absence of proven gambling gains.

In the year 1940 the respondent held that petitioner received $2,450 from protection sources which he failed to report. Although the testimony was not sufficiently precise to verify the exact figures, it was such as to require us to hold that petitioner has not proved respondent's finding to be erroneous.

We have found as a fact that the petitioner filed false and fraudulent returns, with intent to evade tax, for the years 1937 to 1943, inclusive. The evidence shows that the petitioner failed to report large items of income (*M. Rea Gano*, 19 B. T. A. 518). He also attempted to set up large claims for gambling losses against income not realized either as individual or partnership gambling gains. The record shows that he failed to recognize his obligation to his Government to make a full, frank disclosure of all income received and to claim no deduction not legitimately or reasonably supportable. In our judgment the evidence of the intention to file false and fraudulent returns is clear and convincing. See *Max Cohen, supra*.

*Decisions will be entered under Rule 50.*